L79KZAVS

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                        18 CR 735 (KPF)

5  DANIEL ALEJANDRO ZAVALA,

6              Defendant.

7  ------------------------------x

8                                    New York, N.Y.
                                     July 9, 2021
9                                    3:07 p.m.

10
   Before:
11
                  HON. KATHERINE POLK FAILLA,
12
                                     District Judge
13
                        APPEARANCES
14
   AUDREY STRAUSS,
15      United States Attorney for the
        Southern District of New York
16 JUSTIN VICTOR RODRIGUEZ
        Assistant United States Attorney
17
   DAVID PATTON
18 FEDERAL DEFENDERS OF NEW YORK
        Attorney for Defendant
19 BY:  JULIA L. GATTO

20

21

22

23

24

25

L79KZAVS

1          (Case called)

2          MR. RODRIGUEZ:  Good afternoon, your Honor.  Justin

3     Rodriguez, for the government.

4          THE COURT:  Good afternoon to you, sir, and thank you.

5          Ms. Gatto?

6          MS. GATTO:  Good afternoon, your Honor.  Federal

7     Defenders of New York, by Julia Gatto, for Mr. Zavala.

8          THE COURT:  Thank you very much.

9          Mr. Zavala, good afternoon to you, sir.

10         THE DEFENDANT:  Good afternoon, ma'am.  Daniel Zavala.

11         THE COURT:  Mr. Zavala, what I will ask you to do,

12    please, is if you could take your microphone to your left and

13    bring it closer to you, and Ms. Gatto will help you with doing

14    that.

15         Ms. Gatto, my experience these days has been that a

16    combination of the acoustics in this courtroom and the covers

17    on the microphone sometimes make it a little bit difficult, so

18    I'm telling you, and I'm telling everyone who's at the tables

19    in front of me, that if you find it is easier to speak while

20    sitting down, I'll take no offense.  I want to hear you more

21    than I care whether you're standing or sitting, so whatever

22    works for you.

23         Ms. Gatto, are there people here today to show support

24    for Mr. Zavala?

25         MS. GATTO:  Yes, your Honor.  Mr. Zavala's uncle, who

L79KZAVS

1    wrote a letter in support of Mr. Zavala and who is Mr. Zavala's

2    guardian, with whom he lives, is here, traveled from

3    California.

4              THE COURT:  Is this Mr. Kolden?

5              MS. GATTO:  Yes, Mr. Kolde.

6              THE COURT:  How do I pronounce it?

7              MS. GATTO:  I believe it's Kolde.

8              MR. KOLDE:  Kolde.

9              THE COURT:  Kolde.  Thank you.

10             Sir, you'll excuse me, but I've seen a couple of

11   different pronunciations and a couple of different spellings.

12   K-o-l-d-e, sir?

13             MR. KOLDE:  Yes.

14             THE COURT:  I'm only imagining the auto corrects.

15   Thank you.

16             Welcome.  And thank you, first of all, for your

17   letter, but, if I may, thank you, as well, for assisting

18   Mr. Zavala and having a home for him to be at during this

19   period of time.  So thank you.

20             MS. GATTO:  Your Honor, also, a paralegal from my

21   office is here today.  He's worked very closely with

22   Mr. Zavala, and they have formed, as we often do with our

23   clients, a very intimate relationship, so he's come to support

24   Mr. Zavala.

25             THE COURT:  I appreciate it.

L79KZAVS

| | |
|---|---|
| 1 | If I may, may I just be introduced to him?  I know the |
| 2 | attorneys at the Federal Defenders, I know a number of your |
| 3 | social workers.  I haven't the pleasure of meeting all the |
| 4 | paralegals.  So if I have an opportunity to do so, I'd like to. |
| 5 | MS. GATTO:  Yes. |
| 6 | I don't want to mess up Achal's last name. |
| 7 | THE COURT:  We'll just go with Achal for now. |
| 8 | Achal, do you have a last name? |
| 9 | MR. FERNANDO-PEIRIS:  Fernando-Peiris, your Honor. |
| 10 | THE COURT:  I'm not going to get that, but, please, |
| 11 | please, take no offense because I suspect you would prefer I |
| 12 | focus on the sentencing rather than the pronunciation of your |
| 13 | last name, and you will take no offense, correct? |
| 14 | MR. FERNANDO-PEIRIS:  That sounds great, your Honor. |
| 15 | THE COURT:  Thank you very much. |
| 16 | Let me, please, make sure that I have the materials |
| 17 | that I should have for today's proceeding. |
| 18 | I have a presentence investigation report.  It is |
| 19 | dated February 10th of this year.  I have a defense sentencing |
| 20 | submission that's dated June 25th of this year.  I have a |
| 21 | number of exhibits to it, including a number of letters from |
| 22 | Mr. Zavala and his family and his supporters.  And I have a |
| 23 | government sentencing submission that is dated July 1st of this |
| 24 | year. |
| 25 | Mr. Rodriguez, is there anything else I should have, |

L79KZAVS

1   from the government's perspective?

2            MR. RODRIGUEZ:  No, your Honor.

3            THE COURT:  Sir, at this time, is it the government's

4   intention to seek restitution or forfeiture?

5            MR. RODRIGUEZ:  It is not, your Honor.

6            THE COURT:  I will not ask you questions about it,

7   then, sir.

8            I don't mean to have you pop up and down, but let me

9   just ask a few more questions.

10           Sir, has the government had a sufficient opportunity,

11  under Federal Rule of Criminal Procedure 32, to review the

12  presentence investigation report in this case?

13           MR. RODRIGUEZ:  Yes, your Honor.

14           THE COURT:  Do you have any objections to it, sir?

15           MR. RODRIGUEZ:  No, your Honor.

16           THE COURT:  Could I ask you, please, to turn to

17  page -- it's, for me, page 6 of the report.  It's paragraph 16.

18  There are a fair number of abbreviations.  We have CW1 and CC1,

19  and then suddenly we have CS1, and I wasn't sure if that CS1

20  was a different entity than the CW or the CC or whether it's

21  the same.

22           MR. RODRIGUEZ:  So, your Honor, there are three

23  different people who are represented by the abbreviations in

24  this paragraph.

25           THE COURT:  Thank you.

L79KZAVS

1          MR. RODRIGUEZ:  CW1 being Cooperating Witness 1, CC1

2     being Coconspirator 1, and CS1 being Confidential Source 1.

3          THE COURT:  I got it.

4          Okay.  They're all -- I wanted to make sure, and now I

5     know.  Thank you very much, and I will accept that you have no

6     objections to the report.  Thank you.

7          Ms. Gatto, from the defense's perspective, are there

8     other materials that I should have with me today?

9          MS. GATTO:  No, your Honor.

10          THE COURT:  Have you, and has Mr. Zavala, had a

11     sufficient opportunity, under Federal Rule of Criminal

12     Procedure 32, to review the presentence investigation report in

13     this case?

14          MS. GATTO:  Yes, your Honor.

15          THE COURT:  Do you have any objections to its

16     contents?

17          MS. GATTO:  We do not, your Honor.

18          THE COURT:  At the back of the report, beginning, for

19     me, at page 23, there are mandatory standard and special

20     conditions of supervised release.

21          Have you had an opportunity to review those with

22     Mr. Zavala?

23          MS. GATTO:  You know, your Honor, I believe so when we

24     went over the probation report, but I don't want to

25     misrepresent.

L79KZAVS

1           THE COURT:  No, of course not, nor do I want you to.

2      Let me just ask you now the questions that I will eventually

3      ask for and request answers to.

4           One is if you have reviewed them; second is whether

5      there are any objections to the proposed special conditions,

6      several of which, to be clear, are contingent, they may or may

7      not come into play depending on the sentence that I impose; and

8      then, third, if I can refer to these collectively as the

9      mandatory standard and special conditions without reading them

10     word for word into the record.  So please take whatever time

11     you and your client need to review them, and I will wait for

12     you.

13           (Pause)

14           MS. GATTO:  A moment?

15           THE COURT:  Of course.

16           (Pause)

17           MS. GATTO:  Thank you, your Honor.

18           Were you asking about the special conditions, your

19     Honor?

20           THE COURT:  Of course.  Let's go back to them.  Thank

21     you.

22           The special conditions include participating in a

23     cognitive behavioral therapy program.  There is a search

24     condition, there is the recommendation that Mr. Zavala be

25     supervised in his district of residence, and there are two

L79KZAVS

1    other conditions that come into play if there is a period of

2    home detention or home incarceration.  I wanted to make sure

3    you had reviewed those conditions.  I also wanted to know

4    whether there were any objections to any of them.

5              MS. GATTO:  Yes, your Honor, I have reviewed those

6    conditions.  I don't object to the conditions.  We are asking

7    for a sentence that does not include a period of home detention

8    or home incarceration.  We're asking for a sentence that would

9    be, to use the lingo, a straight probationary sentence.

10             THE COURT:  Yes.

11             MS. GATTO:  So, that's my hesitation.

12             But, otherwise, these conditions are not something

13   we'll object to.

14             THE COURT:  And I will be more explicit as well.  As I

15   said, those were contingent conditions, and they might come up,

16   depending on what sentence I choose to impose.  I could impose

17   a sentence that wouldn't involve them, but I did want to know

18   whether, if there was a sentence that might implicate the

19   conditions, there were objections to them.  I didn't think

20   there would be.

21             MS. GATTO:  Correct.

22             THE COURT:  Okay.  Thank you.

23             And may I refer to them as a group?

24             MS. GATTO:  Yes, your Honor.

25             THE COURT:  May I speak with your client about this?

L79KZAVS

1          MS. GATTO:  Yes, please.

2          THE COURT:  Mr. Zavala, you've just heard me speaking

3    with your attorney about the presentence investigation report

4    in this case.  I understand that that's a document that you've

5    reviewed with your attorney.  Is that correct?

6          THE DEFENDANT:  Correct, your Honor.

7          THE COURT:  And your attorney advised me that having

8    reviewed it with her, or perhaps with others in her office, you

9    don't have any objections to the contents of the presentence

10   investigation report.  Is that also correct?

11         THE DEFENDANT:  Correct, your Honor.

12         THE COURT:  At the back of the presentence report,

13   sir, there are mandatory standard and special conditions.  It

14   is my understanding that you've also reviewed those with your

15   attorney; yes?

16         THE DEFENDANT:  Correct, your Honor.

17         THE COURT:  And certain of these conditions are

18   mandatory, and by which I mean I have to impose them, certain

19   of them are standard, and I impose them as a general matter,

20   and there are some special conditions that you've just heard me

21   reviewing with your attorney.  She indicated to me that you had

22   no objections to these special conditions, although there were

23   two that she thought might not come into play at all.

24         Do you understand that?

25         THE DEFENDANT:  I understand.

L79KZAVS

1              THE COURT:  And is it correct, sir, that you don't

2    have any objections to those?

3              THE DEFENDANT:  That is correct, your Honor.

4              THE COURT:  Thank you, sir.

5              Let me, please, then adopt the presentence

6    investigation report, the guidelines calculations that are

7    contained in it, and the factual statements that are made in

8    it.

9              And then let me, please, do this:  Mr. Rodriguez,

10   sometimes I ask questions before hearing the government's and

11   the defense's sentencing positions; now I'll just ask you to

12   fold it in.

13             What I'm trying to understand, as this is my first

14   sentencing in this particular conspiracy, is trying to

15   understand if there is a difference in culpability between

16   Mr. Zavala and Mr. DeAquino and also to make sure I understand

17   exactly what it is the government understands that Mr. Zavala

18   did.  What I have in my notes is that in July of 2018,

19   Mr. Zavala delivered a sample, at the direction of someone

20   else, and it was a sample of fentanyl, or perhaps more than one

21   sample of fentanyl, and then there was a delivery of

22   approximately five kilograms of fentanyl in which he was also

23   involved, and that's what I've got.  And if there's other

24   information that I should know, I'd be interested in hearing

25   it, but to the extent that you can distinguish Mr. Zavala and

L79KZAVS

1    Mr. DeAquino, that might be useful to me.

2            Let me also please note, and I should have begun with

3    this, that I appreciate very much the fact that you have done

4    and jumped through whatever hoops you needed to, to get

5    authorization to request a below-guideline sentence, and I say

6    that because there was a certain measure of credibility that I

7    think might have been spent if I had seen the traditional, "We

8    think a guideline sentence is fine in this case," so I thank

9    you for that.  What I'm trying to do now is make sure I

10   understand the facts of this case so that I can impose an

11   appropriate sentence.

12           Whenever you're ready, sir.  Thank you.

13           MR. RODRIGUEZ:  Thank you, your Honor.

14           So, let me address the difference in culpability

15   between Mr. Zavala and Mr. DeAquino.  But before I do that, I

16   want to be very clear about the source of my information, just

17   so that there is -- if there is any objection to what I am

18   about to say, we can handle that.

19           There are two defendants in this case, Mr. Zavala and

20   Mr. DeAquino, both of whom have pled guilty, both of whom, in

21   the course of their pleading guilty, have, in the government's

22   view, qualified for safety-valve relief from the mandatory

23   minimum sentence.

24           So, as I understand it, your Honor, the statute would

25   prohibit the Court from imposing a harsher sentence on

L79KZAVS

1    Mr. Zavala based on information that he has provided in himself

2    qualifying for the safety-valve relief.  As I understand it,

3    however — and I just want to make sure that we're all on the

4    same page — there would be nothing preventing the Court in

5    sentencing Mr. Zavala from considering information that the

6    government has obtained that it otherwise would not know from

7    his codefendant, Mr. DeAquino, in the course of his

8    qualification for the safety-valve proffer.

9           So, that is how I'm going to be answering the Court's

10   question because — and this would be clear from the complaint

11   that initiated this case — based on the information that the

12   government knew without either safety-valve proffer, it was

13   clear that it was Mr. DeAquino who was in touch with the people

14   acting at the direction of the government, which is to say, the

15   confidential source in this matter.  It was Mr. DeAquino who

16   was in touch with other more senior members of the narcotics

17   conspiracy about particular logistics — who was to get what

18   quantity of drugs, who was to deliver it, where and when it

19   would happen.

20          When the government made the arrests in this case --

21   well, I should back up before I get to the arrest.  The

22   confidential source that was involved in this case obtained

23   samples of fentanyl that he discussed ahead of time with

24   Mr. DeAquino, but it was Mr. Zavala who actually delivered,

25   physically delivered, those samples to him.

L79KZAVS

1        When it came time for the arrest, the transaction that

2   was discussed was a transaction discussed between the

3   confidential source and Mr. DeAquino.  The discussion -- I'm

4   sorry, facilitating that discussion was between the two of

5   them.

6        THE COURT:  May I hear that sentence again, please,

7   sir?

8        MR. RODRIGUEZ:  Yes.  I apologize, your Honor.

9        THE COURT:  Not at all.

10       MR. RODRIGUEZ:  So, this case culminated in an arrest

11  in which Mr. Zavala was arrested while he was in the process of

12  physically delivering five kilograms of fentanyl to a

13  confidential source.  That transaction — where to be, when to

14  be there, what was going to happen — was discussed between the

15  confidential source and Mr. DeAquino.  That was all of the

16  information that the government had up until the time of the

17  arrest.  And I think it's -- it's clear from that, that

18  Mr. Zavala's role was that of a deliveryperson, at least as it

19  related to his interactions with the confidential source.

20       I can proffer to the Court that the government then

21  learned additional information after the arrest, after the

22  charge in this case, that is information not from Mr. Zavala's

23  safety-valve proffer, that fills out the story a little bit

24  more, which is to say that both Mr. Zavala and Mr. DeAquino

25  lived — and I think they both still do live — in California.

L79KZAVS

1   At a certain point, Mr. DeAquino approached Mr. Zavala and

2   discussed with him the possibility of the two of them traveling

3   to New York to make some money and to, I think in vague terms,

4   facilitate drug transactions.

5          Both of them traveled from California to New York.

6   Their tickets were paid for, as the government understands it,

7   by other senior members of the narcotics conspiracy, including

8   those who were located outside of the country and who were not

9   charged or indicted in this case.

10          Once they got to New York, a place for them to live

11   was provided and the money to rent it by other members of the

12   conspiracy, but it was Mr. DeAquino who played a little bit

13   more of an active role in facilitating the transaction that led

14   to the arrests here.

15          And so I think it's fair to say that, based on all of

16   the information that the government can proffer to the Court in

17   connection with this sentencing, that Mr. DeAquino was more

18   culpable, the degree to which is perhaps debatable, but more

19   culpable than Mr. Zavala, given that he played more of a lead

20   role in arranging the transactions and being a communicator

21   with the people who were acting at law enforcement's direction

22   in connection with the transactions.

23          THE COURT:  I appreciate that summary.

24          In the defense's sentencing submission, at page 4,

25   there's a suggestion that -- and perhaps I'm misreading the

L79KZAVS

1    submission, but I thought I understood that Mr. Zavala met

2    individuals in Mexico who were interested in hiring him.

3            MR. RODRIGUEZ:  That's correct, your Honor.  And I

4    think it was Mr. DeAquino acting at the direction of people in

5    Mexico to recruit Mr. Zavala.

6            THE COURT:  Thank you.

7            Please continue, sir.  Thank you.

8            MR. RODRIGUEZ:  So, those were my remarks just to make

9    sure that I addressed the Court's questions about the

10   difference in culpability between Mr. DeAquino and Mr. Zavala,

11   as well as, more particularly, what it is that Mr. Zavala did

12   in connection with this offense.

13           So, more generally, your Honor, with respect to

14   sentencing:  Candidly, your Honor, I think this is a very

15   difficult case.  It's difficult because, on the scale, so to

16   speak, there are very heavy weights, from the government's

17   perspective, on both sides.  On one side of the scale, the

18   mitigating factors, I think Ms. Gatto very appropriately and

19   accurately points them out to the Court, and the government

20   agrees that they are factors that the Court should seriously

21   consider in connection with sentencing.  And these include

22   facts like the defendant's age at the time of the offense, his

23   age now, the fact that this case involved the defendant's

24   first-ever arrest, the fact that he has no history of violence,

25   as well as the fact that now he has a stable job with his

L79KZAVS

1   uncle.  Those are certainly all facts that the Court should

2   very seriously consider.

3            But on the other side of the scale are heavy weights,

4   so to speak, as well, from the government's perspective.  This

5   was an incredibly serious offense, involving an incredibly

6   dangerous substance, fentanyl, and a very large amount of it.

7   Mr. Zavala was arrested while he was delivering five kilograms

8   of fentanyl powder to a confidential source.  He was also

9   staying in an apartment that law enforcement searched in

10  connection with this arrest, and another four kilograms of

11  fentanyl were found there.

12           THE COURT:  For how long did you understand that

13  Mr. Zavala and Mr. DeAquino were staying at this apartment?

14           MR. RODRIGUEZ:  My understanding, your Honor, again,

15  based on the information that I can offer to the Court, is that

16  it was a matter of days, possibly a small number of weeks.

17           THE COURT:  Thank you, sir.

18           MR. RODRIGUEZ:  So, as I was saying, your Honor, we're

19  dealing with an offense that involved an incredibly dangerous

20  drug, and an enormous amount of it.  And I know that the Court

21  is very familiar with the dangers of fentanyl and of the

22  effects that it's having on our community, how addictive it is

23  and how deadly it can be.  And so it's impossible, when

24  considering what the appropriate sentence should be in this

25  case, not to think of all of the people who could have been

L79KZAVS

1   harmed if these drugs had reached the community rather than

2   being intercepted by law enforcement.  And that's something

3   that the Court should very strongly consider.

4        Another factor on that side of the scale would be the

5   message that this Court's sentence sends to other people who

6   may be tempted by the allure of quick and easy money to engage

7   in this kind of conduct.  The Court's sentence should send the

8   message that it just cannot be, and should not be, worth it,

9   because the consequences are simply too high.  And so, from the

10  government's perspective, that's another factor that the Court

11  should very seriously consider.

12       The Court, obviously, has enormous discretion in

13  fashioning the appropriate sentence here.  There's a very wide

14  range of reasonable sentences that the Court can impose.  But

15  for all of the reasons that I just mentioned, the Court should

16  very seriously consider not only the mitigating factors that

17  Ms. Gatto has pointed out and that the government acknowledges,

18  but the factors on the other side of the scale as well.

19       Thank you, your Honor.

20       THE COURT:  Sir, thank you very much.

21       Ms. Gatto, just please give me a moment to finish

22  taking notes.

23       Ms. Gatto, I'll hear from you now.  There is one

24  thing, and it may end up being an academic discussion, but I

25  did want to address it nonetheless.  This is not the first case

L79KZAVS

1    I've had with your office, and a lot of times what I am told at

2    sentencing, when it comes to the issue of general deterrence,

3    is that it's not the amount of the sentence, but the certainty

4    of jail time that is the important thing, and so people have

5    said to me, if you're going to impose jail time, Failla, it

6    doesn't have to be a lot because it is the certainty of jail

7    time, and I'm trying to reconcile that with what Mr. Rodriguez

8    has just said about deterrence in this case and with the

9    arguments that you're making to me now.

10              So, I want to hear everything you want to tell me, but

11   I think you know the argument that I'm talking about, and I'm

12   just trying to, for lack of a better term, tease it out as it

13   applies to cases of this type.  Thank you.

14              MS. GATTO:  Thank you, your Honor.  And I

15   appreciate -- as the Court noted, I appreciate the government's

16   letter and their remarks here because it acknowledges the real

17   mitigation here in this case, a large part of that being

18   Mr. Zavala's age when he committed the offense and his age now,

19   but really his age when he committed the offense.  He was 19

20   years old, and I will never forget the day the case came in.

21   I've had thousands of cases, your Honor, as a Federal Defender,

22   over a thousand cases.  And I saw Mr. Zavala in pretrial, his

23   mouth full of braces, having a panic attack, and I said this is

24   a child, it is the youngest offender I've ever represented, and

25   I wouldn't be surprised, from the government's perspective, is

L79KZAVS

probably one of the youngest in their office — 19 years old, a

teenager.  And it matters for the Court's consideration because

this conduct, which is egregious, and the government is

absolutely right, the type of drug involved here and the

quantity of drugs involved here make this case very serious.

Mr. Zavala's knows that, he knows that intimately because he

watched his father struggle with drug addiction, so it's not

something that he's unaware of, and it's not something that

since that moment, he's thought about.  But his decision-making

leading up to the offense, his decision-making up until that

arrest, was infantile decision-making, and that's why it's

mitigating, and that's why I think everybody — probation, the

government, and I think the Court, also — acknowledges it needs

to be considered, and the system generally, I think, recognizes

that.  The brain is not fully formed as a teenager, he's not

making decisions as an adult, and, because of that, the

punishment should be considered.

        This Court recognizes that.  We have the youth

diversionary court, your Honor, and I don't know how familiar

you are with the program.  When Mr. Zavala came in, and the

government might remember this — it might not because it's been

so long — I worked very hard to try to get Mr. Zavala into the

youth court, and I spoke with the people who were running it

there, and he qualified in every way, in fact, he was exactly

the type of kid who should be in youth court, and it could not

L79KZAVS

1   get done because Mr. Zavala lived in California, and the youth

2   court here couldn't supervise him.  So then we reached out to

3   Federal Defenders over there.  They don't have a youth court

4   there, they had another program that wasn't really exactly

5   right, and so he couldn't benefit from that program.  And that

6   program, as the Court probably knows, is pretty intense

7   supervision, and, at the conclusion of it, one potential

8   outcome is that there's no felony conviction.

9           We couldn't do it not because he didn't qualify for

10  it, not because he wasn't appropriate for it, not because he

11  wasn't motivated to do the program, but because of these

12  logistics.  And when Mr. Zavala — and we talked a lot about it

13  in the beginning of the case, and when Mr. Zavala found out he

14  couldn't do the program, he was still interested in the

15  programming of the program, because Mr. Zavala, to say that

16  this arrest was the turning point in this young man's life is

17  not strong enough.  When I describe that panic attack, what

18  that was was a moment of realization of, oh, my God, right, my

19  decision-making was so poor, and this is where I am, and how

20  scary that was.  And, your Honor, when you -- I'm going to talk

21  more about general deterrence, but when we talk about the

22  things, the messages to the public that scare people, right,

23  because that's what it is, don't do this, bad things will

24  happen if you do it — that's how I see deterrence — should

25  someone be looking at this case, bad things happened to

L79KZAVS

1    Mr. Zavala, okay?  That panic attack, that moment, that fear

2    that he's really been dealing with, and I commend him because

3    he's really handling the stress of this case remarkably, which

4    wasn't always the case for him to handle stress well, it is a

5    deterrent.  It is certainly a deterrent to Mr. Zavala, but I

6    submit to your Honor it's also a deterrent to the public.  And

7    while I'm there, before I move on from deterrence, to answer

8    the Court's question, this young man is straddled with a felony

9    that will carry with him forever.  He is really just embarking

10   on adult life.  He has a stable job, he has a stable place, but

11   that felony will be a dark cloud, and I know it because I have

12   other clients who I keep in touch with, and that felony, it

13   doesn't go away, it's a scar, and it is forever on his record —

14   he is a felon.  That also is a powerful message to Mr. Zavala

15   certainly, but it's really accomplishing the needs of general

16   deterrence, that a kid at 19 is forever straddled with a felony

17   and all the attendant consequences of that, that are really

18   lifelong, does send a powerful message.

19        But back to Mr. Zavala:  What is remarkable about this

20   case for me — and we've been together so long, and in a way,

21   COVID, which has delayed things in many cases, I think it's

22   been really useful, and I hope, for the Court, you'll consider

23   the progress -- this young man has turned from a boy to a man

24   in the last three years, and, for a large measure, I think it's

25   on account of this case and the cause of self-reflection.  It's

L79KZAVS

1  certainly because of his uncle and his aunt, Mr. Kolde, who's

2  here, who, again, another moment I'll never forget, when we

3  called Mr. Kolde together after he was arrested, and Mr. Kolde

4  was, come home, right, come home.  It's actually very emotional

5  because these people, his aunt and uncle, took this boy, who

6  really had no home, who had been chasing the love of his

7  parents, who'd been shuttled around the country and Mexico

8  without real concern about his well-being, there were these

9  people, finally, so late in life, really, who were like, no,

10  come home.  And there's that line in Mr. Zavala's letter that's

11  a letter from his heart, and I know you can read it, where he

12  says I finally feel like I'm home.

13          Your Honor, he didn't have that at 19.  It's not just

14  easy money, it was so much more complicated for him.  It was

15  traveling to New York, the big city, it was the allure of the

16  gestalt of the whole thing for a kid, you know.  It felt like a

17  TV show.  And I say that, I'm not quite sure if that's

18  mitigating or not, but that's really what it was.  He was a

19  kid.  And then he came home after this arrest, to Mr. and

20  Mrs. Kolde, and he has worked really hard, your Honor, in these

21  three years.  He got himself in therapy, and that was him, he

22  called -- when he couldn't get in the program, he was so

23  intrigued by the ADF counseling, and it was difficult because

24  we had our social workers here trying to figure out California,

25  but he did it, he did that, and he's benefited from it, and

L79KZAVS

1    he's working through abandonment issues and childhood neglect

2    and trauma, and he's doing that, yes.

3            THE COURT:  May I ask about he has a brother and a

4    sister, correct?

5            MS. GATTO:  Yes.

6            THE COURT:  Where are they?

7            MS. GATTO:  I don't know, your Honor.  If you give me

8    a moment?

9            THE COURT:  Sure, because I'm concerned about them,

10   too.

11           (Pause)

12           THE COURT:  Oh, two sisters?

13           MS. GATTO:  Yes.

14           THE COURT:  One sister, perhaps, has a hearing

15   impairment?

16           MS. GATTO:  Yes.

17           (Pause)

18           MS. GATTO:  Mr. Zavala's oldest sister — that's the

19   sister who is hearing impaired — has her own family.  She's

20   married, and she lives in Arizona.  And I remember because when

21   we were talking, we had to make a bail modification because

22   after the baby came, Mr. Zavala was able -- or tried to, I

23   can't remember, but there was attempts to, and maybe work

24   interfered, but there was a bail application for him to go

25   visit her.

L79KZAVS

1          The younger sister is with Mr. Zavala's mother in

2    Mexico.

3          Back to his journey, your Honor, and I don't mean to

4    beat a dead horse.

5          THE COURT:  No, no, no, you're not.  And you'll excuse

6    my detour, but Mr. Kolde has done such a remarkable job in

7    taking him in.  You'll excuse me if I worry about his siblings.

8          MS. GATTO:  No, and I appreciate that, your Honor, and

9    it's thoughtful in the true sense of the word.

10          So, in addition to therapy, there was this period of

11   time leading up to the offense where I think Mr. Zavala was --

12   and I don't think it's unusual for a 19-year-old kid, actually,

13   to feel this kind of, like, my future is grim.  You know, he

14   worked really hard in school, but it wasn't the kind of degree

15   that was opening up doors.  He really wanted to be a marine,

16   but he just really had trouble no matter how hard he tried to

17   pass the test, and it's hard to articulate how difficult that

18   is to overcome, and how difficult it is to overcome after

19   you're coming home after being arrested and charged in a very

20   serious case, and the work it took to overcome that.  And he

21   describes his future now not as grim, right, he's gotten over

22   that.

23          Another line from his letter that resonated with me,

24   and I wouldn't be surprised if it resonated with the Court, is

25   when he describes going to work every day and the value he gets

L79KZAVS

1     from that.  He's in a relationship.  He plans to marry his

2     girlfriend.  He derives great pleasure from being kind of a

3     mentor and a big brother to Mr. and Mrs. Kolde's younger

4     children who are ten and six.

5             THE COURT:  Let the record reflect many a nod from

6     Mr. Kolde.

7             MS. GATTO:  And when I call over there, and we get to

8     talk, you can hear, there's delight in the children playing

9     with their cousin.  They feel lucky to have him, and he feels

10    lucky to have them.

11            I think the point is, your Honor, it is an

12    extraordinary case, and it is hard, and I fully adopt the

13    government's representations and join in them about how serious

14    the offense is, your Honor, it is, but we're faced here with

15    the question of really what do we do with this individual?

16    What needs to be done to accomplish all the goals and

17    objectives, all of them — general deterrence, specific

18    deterrence, rehabilitation?  To me, your Honor, the answer, and

19    I hope for you, too, your Honor, the answer — I really

20    respectfully really urge the Court to consider — does not have

21    to include jail, even a small period.  The probation

22    department, which also acknowledged all the mitigation here and

23    did something kind of extraordinary, in my experience, by

24    recommending a giant downward variance, they still recommend

25    what some other judges in this court call a taste of jail.  You

L79KZAVS

1   know, I've had that --

2            THE COURT:  That's not an expression I will use.

3   Thank you.

4            MS. GATTO:  I don't like that expression, your Honor,

5   but I think that there sometimes is in a serious case with the

6   idea that some small period of jail is necessary, and I ask you

7   to really look long and hard on this idea that any period of

8   jail is necessary.  We have a system that recognizes that you

9   can punish people, you can serve the objectives of 3553 without

10  prison.

11           I think we should be considering it even more now,

12  considering the conditions inside, which are deplorable.  I

13  hope they're getting better, your Honor, but you know just as

14  well as I what is going on in there.  And I think that that's a

15  consideration, also.  This young man is at a place where he — I

16  can say this with full confidence, and I think the Court can

17  have confidence, too, in this — is about to embark on a

18  law-abiding, productive adulthood.  And that's what our system

19  is really about, your Honor, so a --

20           THE COURT:  Slow --

21           MS. GATTO:  -- derailing prison sentence now is the

22  opposite, I think, of what we want to do, what we're required

23  to do, under the sentencing laws.  And so, for all of those

24  reasons, we ask you to consider a sentence that does not send

25  Mr. Zavala to jail, continues him with the support and guidance

L79KZAVS

1  of these loving people, and allows him to go forward on the

2  path that he's chosen.

3          THE COURT:  Is it Mr. Zavala's contemplation that, if

4  he is not sentenced to a term of imprisonment, that he will

5  continue to live with the Koldes?  Or if you'd like me to ask

6  this another way, once this proceeding ends, is he moving out?

7          MS. GATTO:  No, your Honor.  That's his home.  And --

8          THE COURT:  Until he gets married?

9          MS. GATTO:  Yes, your Honor.  He's there.

10          THE COURT:  Unless, of course, she moves in, too.

11          MS. GATTO:  No, this is his home.  They've packed

12  their lunches together and off they go.  This is home for him.

13          THE COURT:  And they work together as well?

14          MS. GATTO:  Yes.  Mr. Kolde is his boss, as he told me

15  earlier today.  And as I commented, in every aspect, even at

16  home, but, yes, they work together.

17          THE COURT:  Thank you very much.

18          Mr. Zavala, if you'd like to speak to me at this time,

19  you are invited to do so.  I want to make clear that you aren't

20  under an obligation to speak to me, but you're invited to do

21  so.  And so, if you do want to speak, you can.  Here's what

22  I'll ask:  So that we can hear you, especially the court

23  reporter and myself, if you could speak louder and slower than

24  you think you need to because I hope you've noticed I've been

25  taking notes of what everyone has said, and I want to take

L79KZAVS

1   notes of what you say to me as well.

2           Would you like to speak at this time, sir?

3           THE DEFENDANT:  Yes, your Honor.

4           THE COURT:  Okay.  You may begin when you are ready,

5   sir.

6           You can stay seated, it's okay.  I just want to hear

7   you.  I don't care what position you're in when I hear you, I

8   just want to hear you, sir.

9           THE DEFENDANT:  Okay.  First of all, excuse me, I'm a

10   little nervous.

11           THE COURT:  Of course.

12           THE DEFENDANT:  I would like to thank you for your

13   time and thank everyone here, also.

14           I want to say how life changing every day has been

15   since that day, how my life has changed thanks to these people

16   who have been helping me, and my uncle also for his support,

17   his father role that's also in place, and also my godfather of

18   my First Communion that I just did.

19           THE COURT:  That's now happened?

20           THE DEFENDANT:  Yes.

21           THE COURT:  It traditionally happens in May, so you

22   had First Communion this past --

23           THE DEFENDANT:  My Confirmation, yes.

24           THE COURT:  You did it at the same time?

25           THE DEFENDANT:  It's like, yes, but one week, it was

L79KZAVS

1    First Communion, and then the second week, it was a

2    Confirmation.

3              THE COURT:  Thank you.

4              And congratulations.

5              THE DEFENDANT:  Thank you.

6              And with that, I want to focus on my goals right now.

7    I'm working with my uncle.  He's teaching me his way.  And then

8    this is a person who I thought of when -- when I got arrested.

9              THE COURT:  Just so what you're saying is, at this

10   moment of despair, the first person you thought of to help you

11   was your uncle?  Yes?

12             THE DEFENDANT:  Yes.

13             THE COURT:  And he did, right?

14             THE DEFENDANT:  Okay.  That will be it.  Thank you.

15             THE COURT:  Of course.

16             Let me just do this, sir.  Sometimes folks speak with

17   their attorneys, and then they want to add something else.  You

18   don't have to, I've heard a lot from you today, but just as I

19   ask other people in your position, I'll just ask you to speak

20   with your attorney.  If you want to speak with the paralegal,

21   you can as well, and if there's anything else you'd like me to

22   know, please do so.

23             (Pause)

24             MS. GATTO:  Thank you, your Honor.  We're ready.

25             THE COURT:  Thank you.

L79KZAVS

1           What I'd ask -- Mr. Zavala, my practice is that I

2     don't come on the bench with a sentence in mind, I want to hear

3     from everybody.  What I'd like to do, if you'll excuse me, is

4     I'm just going to sit here for a minute or two, or maybe three,

5     I just want to gather together the notes that I've taken so

6     that I can be better prepared for sentencing.  So, I didn't

7     want you to be surprised or anxious about what I'm doing.  What

8     I'm doing is just thinking about everything that I've just

9     heard.

10          Do you understand, sir?

11          THE DEFENDANT:  Yes.

12          THE COURT:  You understand?  Okay.  Thank you.

13          (Pause)

14          THE COURT:  Let me please, again, thank you very much.

15    I'm going to outline the sentence that I intend to impose, but

16    I will give each side an opportunity to make legal objections

17    before the sentence is actually imposed.

18          In imposing this sentence, I've looked at, and we've

19    talked about this afternoon, factors that are set forth by

20    Congress in Section 3553(a) of Title 18 of the United States

21    Code, and these factors include:  The nature and circumstances

22    of the offense, the history and characteristics of Mr. Zavala,

23    the need for the sentence imposed to reflect the seriousness of

24    the offense, to remote respect for the law, to provide a just

25    punishment for the offense, to afford adequate deterrence to

L79KZAVS

1    criminal conduct, to protect the public from further crimes by

2    Mr. Zavala, to provide him with needed educational and

3    vocational training, medical care, or other correctional

4    treatment in the most effective manner.  I must consider the

5    sentencing guidelines; I'll do so momentarily.  I must consider

6    the need to avoid unwarranted sentence disparities among

7    similarly situated defendants.

8           My guidelines calculations replicate those in the

9    presentence investigation report.

10          Under guideline Section 2D1.1, there is a base offense

11   level of 34, based on the quantity of fentanyl.  There is a

12   two-level reduction based on what we call the safety-valve

13   proffer.  There is a three-level reduction for acceptance of

14   responsibility, and that yields an adjusted offense level of

15   29.

16          Mr. Zavala has no criminal history and no criminal

17   history points.  He is in Criminal History Category I, and the

18   resulting guidelines range is 87 to 108 months.

19          The probation office is recommending a downward

20   variance to six months in jail and six months' home

21   confinement; the government is asking for a nonguideline

22   sentence; the defense is asking for a nonguidelines sentence

23   with no jail time.  And let me begin.

24          I know I heard this from Mr. Rodriguez — I don't think

25   Ms. Gatto disagrees — that this is a very difficult sentence,

L79KZAVS

1    this is a very difficult case.  And, usually, when litigants --

2    when attorneys tell me that, I'm put off by that because it is

3    my job to sentence people, and, therefore, yes, they're all

4    difficult, but there are things that I can do, but I will say

5    this:  This is a case that I have spent many days thinking

6    about, and it is more difficult than usual, and, in fact, to a

7    degree, I've actually been thinking about this case since

8    Mr. Zavala was granted bail, and that is because, in cases of

9    this type, when one is on bail, there is a sense of which this

10   can be viewed as — and please take this the right way — a dress

11   rehearsal or an audition for how one would be after sentencing.

12   And so I've been watching and mindful of what Mr. Zavala has

13   done while on pretrial release.

14        I echo everything that has been said about the

15   mitigation factors of the upbringing, what appears to be

16   aberrant nature of the conduct, the lack of violence, the small

17   and poorly compensated role, the family dynamics in this case,

18   which have an element of dysfunction to them, the postoffense

19   rehabilitation, the issues of sort of brain development and

20   maturity, but, as indicated by the questions that I asked this

21   afternoon, on the other side of the ledger, I have been

22   thinking about general deterrence, and I have been thinking

23   what I think we all acknowledge about how serious this conduct

24   is.

25        An argument can be made that the two concerns that

L79KZAVS

1   I've just identified are best resolved by a modest period of

2   jail time.  I will not use the expression that you gave me a

3   few moments ago.  I have feared, and I continue to fear,

4   eroding the progress that Mr. Zavala has made while on pretrial

5   release, and it's not clear to me that individuals who might be

6   thinking about engaging in this conduct would be motivated or

7   not motivated simply by what happens to Mr. Zavala.

8          I also had not focused, until this afternoon, on the

9   conditions in federal facilities these days, in light of the

10  pandemic.  I think those of us who look at facilities on a

11  regular basis know that there are troubles that they are

12  working through, both pandemic-related and otherwise.  And what

13  I have noticed is the distinct absence of support, of mental

14  health programs, of any of the things that Mr. Zavala needs.

15  And so, ultimately, I've decided that I can vindicate the

16  concerns that I have and to best balance the goals of

17  sentencing without asking Mr. Zavala to go back to jail, and

18  I'm, therefore, not going to do that, but — listen, listen —

19  while I am imposing a term of time served, I'm ordering that

20  that be followed by three years of supervised release, for

21  which the first six months are a condition of home detention,

22  and I'll explain what I mean by that in a moment.

23         There are other mandatory and standard and special

24  conditions of supervised release that we talked about at the

25  beginning, but, generally speaking, when I say home detention,

L79KZAVS

1    what I mean is that you would be restricted to your residence

2    except for employment, education, religious services, mental,

3    substance abuse or mental health treatment, attorney visits,

4    court appearances, court-ordered obligations, or other

5    activities that are preapproved by the probation office.  And

6    on that point, I just want to put something out there:  I think

7    of home detention as a punishment, and, because of that, what

8    I'm sort of saying to those of you at the back table is that I

9    don't expect there could be a lot of requests for weekends off

10   or family holidays or whatever it is; it's six months.  You can

11   stay home for six months, especially because you will be out of

12   the house for work and worship and things of that nature.

13        I will allow the probation office to determine what is

14   the best way of location monitoring, if they decide that it is

15   needed.  I'm not sure it is, and if they want to do it by

16   something like telephone monitoring or something like FaceTime,

17   that's fine, let them decide.  And I would also expect that

18   supervision would be accomplished in your district of

19   residence, so whatever they think is the best.

20        So I'm not imposing -- I'm imposing a term of time

21   served.  I'm imposing the term of supervised release.  I'm not

22   imposing a fine or restitution or forfeiture.

23        I am obligated to impose a mandatory special

24   assessment of $100.

25        Mr. Rodriguez, is there any legal reason why I may not

L79KZAVS

1    impose the sentence that I've just outlined?

2              MR. RODRIGUEZ:  No, your Honor.

3              THE COURT:  Ms. Gatto, is there any legal reason why I

4    may not impose the sentence that I have just outlined?

5              MS. GATTO:  No, your Honor.

6              THE COURT:  Mr. Zavala, please rise.

7              Mr. Zavala, after considering all of the factors that

8    are set forth in Section 3553(a) of Title 18 of the United

9    States Code, I find that a term of time served is sufficient,

10   but not greater than necessary, to comply with all of the

11   purposes of sentencing.  That time will be followed by a term

12   of three years of supervised release, with the mandatory, the

13   standard, and the special conditions that I've outlined,

14   including a requirement that the first six months be served in

15   home detention.

16             I am not imposing a fine or restitution or forfeiture.

17             I must impose a $100 mandatory special assessment.

18             Do you understand, sir?

19             THE DEFENDANT:  I understand, your Honor.

20             THE COURT:  Please be seated, sir.

21             Mr. Zavala, except to the extent that you may have

22   waived this in any plea agreement that you may have with the

23   government, you have the right to appeal from your conviction

24   and from your sentence, and if you are interested in appeal,

25   you may do that.  Generally speaking, you have two weeks from

L79KZAVS

1    the date the written judgment is entered, and that will

2    probably be sometime in the early part of next week.  If appeal

3    is something you are interested in, please speak with your

4    attorney because she is familiar with the process.

5             Do you understand what I've just said, sir?

6             THE DEFENDANT:  I understand, your Honor.

7             THE COURT:  Mr. Rodriguez, are there open counts that

8    require dismissal?

9             MR. RODRIGUEZ:  There are not, your Honor.

10            THE COURT:  Mr. Rodriguez, from the government's

11   perspective, is there anything else I need to do today?

12            MR. RODRIGUEZ:  No, your Honor.  Thank you.

13            THE COURT:  Thank you.

14            Ms. Gatto, from the defense's perspective, is there

15   anything I've neglected to do?

16            MS. GATTO:  No, your Honor.

17            THE COURT:  May I speak with your client?

18            MS. GATTO:  Yes.

19            THE COURT:  May I speak with your client's uncle?

20            MS. GATTO:  Yes.

21            THE COURT:  Mr. Kolde, in eight years of being a

22   judge, I've only twice done this, so you are my second time.

23   It is a burden for me to impose on you, but I'm going to do

24   this.  Ms. Gatto will tell you that I'm not soft at sentencing,

25   or maybe she will tell you I am — I don't think I am — but I do

L79KZAVS

1    commit to you, sir, that if Mr. Zavala commits a crime or

2    violates his terms of supervised release while on supervised

3    release, there will be consequences.  So I am asking you to be

4    aware that he has these consequences, and to help him comply

5    with all of them, because I'm sure you would agree with me that

6    being home with you and your family is better than being in

7    jail.

8             Do you understand that I have just imposed conditions

9    of supervised release on him that he has to follow?

10            MR. KOLDE:  Yes, your Honor.

11            THE COURT:  Do you understand, sir, what I have just

12   said, that if he violates them, there will be consequences?

13            MR. KOLDE:  Yes, your Honor.

14            THE COURT:  Thank you, sir.

15            Mr. Zavala, I tell you the same thing.  Your attorney

16   has described your journey during this process as one of being

17   scared and learning from that fear.  There is a healthy amount

18   of fear I'd like you to retain while you are on supervised

19   release, not to paralyze you in any way, but to make sure you

20   understand the seriousness of what you did, and that you don't

21   do it again.  And so I am asking you to be very careful and

22   mindful of your supervised release conditions, to remain far

23   away from criminal activity, to reach out to your new friends

24   at the Federal Defenders if you have questions, and to

25   understand how close you were to jail time.

L79KZAVS

1              Do you understand that, sir?

2              THE DEFENDANT:  I understand, your Honor.

3              THE COURT:  Mr. Zavala, it is my expectation that you

4    and I will not see each other in this context again, and so I

5    will simply wish you well and express my hope that you and I

6    not see each other in this context again.

7              Thank you, sir.

8              THE DEFENDANT:  Thank you, your Honor.

9              THE COURT:  We are adjourned.  Thank you.

10             MS. GATTO:  Thank you, your Honor.

11                              * * *